```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
In re                                   :
LEHMAN BROTHERS HOLDINGS, INC., et al., :
                   Debtor.              :
                                        :
----------------------------------------:   08 Civ. 8869 (DLC)
                                        :   08 Civ. 8914 (DLC)
BAY HARBOUR MANAGEMENT, L.C., et al.,   :
                   Appellants,          :      OPINION & ORDER
                                        :
              -v-                       :
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.   :
                   Appellees.           :
----------------------------------------X
```

Appearances:

For Appellants:
David S. Rosner
Andrew K. Glenn
Ronald R. Rossi
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

For Appellee Barclays:
Lindsee P. Granfield
Lisa M. Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

For Appellee Lehman Brothers Holdings Inc.:
Harvey R. Miller
Michelle J. Meises
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

For Appellee James Giddens, SIPA Trustee:
James B. Kobak, Jr.
David W. Wiltenburg
Sarah L. Cave

Jeffrey S. Margolin
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

DENISE COTE, District Judge:

This bankruptcy appeal arises out of the financial collapse of Lehman Brothers in 2008, when it was the fourth largest independent investment banking and financial services enterprise in the United States.  Barclays Capital, Inc. ("Barclays") purchased certain divisions of Lehman Brothers within days of Lehman Brothers declaring bankruptcy on September 15, 2008.  Bay Harbour Management, L.C., Bay Harbour Master, Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks (collectively, "Appellants") appeal from the order approving the sale of Lehman's North American registered broker-dealer subsidiary Lehman Brothers International ("LBI") to Barclays "free and clear of liens and other interests" ("Sale Order"),[1] entered on September 20 by United States Bankruptcy Judge for the Southern

---

[1] Appellants also appeal from a September 20 derivative order of the bankruptcy court incorporating the Sale Order, which was entered in adversary proceedings in the Lehman bankruptcy cases filed under the Security Investor Protection Act ("SIPA") against LBI.  At the request of the Securities Investor Protection Corporation ("SIPC"), on September 19 the U.S. District Court for the Southern District of New York entered an order placing LBI in liquidation under SIPA.  The district court then transferred the SIPA proceeding to the bankruptcy court.

District of New York James Peck.  For the following reasons, the Sale Order is affirmed.

BACKGROUND

The debtors in this action are Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC ("LB 745") (collectively, "Debtors").  LBHI is the parent corporation of the numerous subsidiaries and affiliates that constituted the global Lehman enterprise.  Appellants are investment funds that maintained prime brokerage accounts with LBI and Lehman Brothers Inc. (Europe) ("LBIE"), Lehman's major European investment banking and capital markets subsidiary.[2]

Appellants challenge the Sale Order that governs Barclays's purchase of LBI's investment banking and capital markets operations and supporting infrastructure, including the Lehman headquarters building in Manhattan.  Appellants speculate that they may have been harmed by an alleged transfer of funds that may have benefited Barclays.  On this basis, they seek to revise a crucial term of the sale.[3]  They contend that the bankruptcy

---

[2] A prime broker is a broker who offers professional services specifically aimed at large institutional customers, such as hedge funds and money managers.

[3] Appellants did not clarify until their reply brief that they were not challenging on appeal the sale to Barclays but only that term of the sale which gave Barclays the assets free and clear of liens.

court's expedited review of the proposed sale was so grievously flawed that it (1) deprived Appellants of their due process right to learn whether Barclays was a good faith purchaser of LBI and (2) did not provide an adequate basis for the bankruptcy court itself to conclude that the sale to Barclays should be approved free and clear of liabilities due to Barclays's status as a good faith purchaser.  Appellants assert these rights even though any claims they may have to any transferred funds are entirely derivative of LBIE's claims, and LBIE supported the sale.  The chronology of Lehman's bankruptcy and the relevant proceedings before the bankruptcy court are summarized here.

Lehman's Collapse and Bankruptcy Filing

After over 150 years as a leader in financial services, Lehman crumbled during a period of extraordinary distress in the U.S. financial markets.  As Lehman faced constraints on its ability to borrow, it was forced to tap its own cash reserves to fund transactions and had difficulty operating its businesses. Lehman tried to save itself, first by searching for a buyer and then by asking for federal bailout funds.  Neither course of action worked.  On September 15, 2008, LBHI filed for bankruptcy; LB 745 followed suit the next day.

Sale Procedures Hearing

By 7:00 a.m. on September 15, Barclays had already begun negotiating a purchase of LBI.  The following day, Barclays and LBHI executed an Asset Purchase Agreement setting out the terms of Barclays's proposed purchase of LBI's investment banking and capital markets businesses and supporting infrastructure for approximately $1.7 billion.  On September 17, the Debtors filed with the bankruptcy court a motion to schedule an expedited sale hearing.

The bankruptcy court held a hearing on September 17 to consider the sale procedures.  Debtors emphasized that time was of the essence because LBI was a "wasting asset."  While Appellants objected, the Securities and Exchange Commission ("SEC"), the Federal Reserve Bank of New York ("Federal Reserve"),[4] and SIPC supported expedited review.  At the hearing, LBHI's Chief Operating Officer Herbert McDade testified that if a sale were not approved by September 19, Lehman would likely disappear as a going concern.  Although Fed. R. Bankr. P. 2002(a)(2) prescribes a twenty-day notice period, the bankruptcy court found cause to shorten the notice period to two days.  The court found that the Debtors' estates would suffer "immediate

---

[4] The Federal Reserve explained that only one or two entities met both the regulatory and financial qualifications to bid successfully for LBI.

and irreparable harm" if preliminary relief were not granted "on an expedited basis."

In approving the expedited schedule, the bankruptcy court explicitly considered due process issues. It heard arguments that financial markets participants had known for months that Lehman's assets were for sale. It also took judicial notice of the fact that interested parties and spectators filled two courtrooms and overflow rooms for the hearing: "there's no question that parties-in-interest and parties who are just plain interested know about today's hearing." Acknowledging that the proposed sale was "an absolutely extraordinary transaction with extraordinary importance to the capital markets globally," the bankruptcy court scheduled the sale hearing for two days later, September 19. Given the circumstances, the bankruptcy court said that emailing, faxing, and overnight mailing of the notice of the motion and sale hearing to a number of specified entities would constitute "good and sufficient notice." The parties do not dispute that such notice was effected.

The court allowed interested parties to file written objections or make oral objections to the proposed sale any time up to the conclusion of the sale hearing. Over the next two days Debtors' counsel made themselves available to answer questions about the proposed sale on a twenty-four hour basis. At 3:00 p.m. on September 18, they hosted a conference for the

purpose of soliciting questions.  At no time before the sale hearing did Appellants attempt to take any discovery from Barclays.

Sale Hearing

On the afternoon of Friday, September 19, interested parties and spectators again filled Judge Peck's courtroom and two overflow courtrooms for the sale hearing, which lasted until early the next morning.  Debtors offered testimony about the sale's urgency.  LBHI COO McDade testified that the "state of affairs at Lehman Brothers Holdings Inc. and LBI is critical." If the sale did not close that day or over the weekend, according to McDade, "the effect on the broker-dealers business and on Lehman Holdings would be devastating."[5]  Broker-dealer customers were threatening to take their business elsewhere.  He warned that a failure to consummate this sale might "ignite a panic in the financial condition" of the country.

Debtors also offered the testimony of Barry Ridings, head of capital markets at Lazard Frères & Co., who was retained by Lehman to provide advice about the sale.  Ridings echoed McDade. He emphasized that time was of the essence, that no other party

---

[5] Debtors explained inter alia that in just the past week, the value of assets to be transferred to Barclays had declined from roughly $70 billion to less than $50 billion.

7

had shown interest in purchasing LBI, and that nothing would be left of Lehman if the sale were not approved quickly.

At the hearing, Debtors also explained the history of the sale process and course of negotiations.  They noted that Lehman had looked for a purchaser months before filing for bankruptcy, but to no avail.  Both McDade and Ridings testified that the terms of the post-bankruptcy sale of LBI had been negotiated "aggressively" and "at arm's length."  In addition, Ridings testified that the transaction "served the best interest of the creditors, the public and the nation."  According to the terms of the sale, Barclays assumed billions of dollars in liabilities, and paid over $1 billion in cash to the Debtors.  In addition, customer accounts would be saved from being frozen indefinitely and 9,000 jobs would be saved for at least ninety days.  The Federal Reserve, the SEC, and SIPC supported the sale, and the Official Creditors' Committee did not object to it.

Appellants attended and participated in this hearing. Parties were permitted to lodge objections and to clarify the terms of sale.  Appellants' attorneys cross-examined McDade -- other attorneys cross-examined Ridings -- on their understanding of the terms of the sale.  Although Appellants now claim that it was difficult to hear the sale hearing proceedings, Appellants did not raise this concern during the hearing.

The Appellants objected to the sale on the ground that questions about the fate of so-called "Defalcated Funds" purportedly owed to LBIE precluded a finding that Barclays was a good faith purchaser.  This issue had its genesis in the disclosure made by the Joint Administrators of LBIE on September 19.

The Joint Administrators of LBIE had taken over LBIE's operations pursuant to British insolvency laws and filed papers advising the bankruptcy court that a "preliminary investigation" had "revealed evidence of substantial transfers of securities out of LBIE which merit close investigation."  Clients had been transferring their securities from Lehman to other prime brokers.  Those securities that had been transferred from LBIE to LBI had already been transferred to a Lehman entity located in Luxembourg, and possibly from there to a new prime broker.  As a result of the transfers of securities out of LBIE, it appeared that LBIE was owed $8 billion.  These missing funds were referred to as the "Defalcated Funds."

As noted, on the basis of the Defalcated Funds issue, Appellants objected to the sale.  Appellants claimed that it was possible that some of the assets being sold to Barclays derived from the Defalcated Funds.  They speculated that the transfer of the Defalcated Funds might have been manipulated to prop up LBI for sale, or to fund Debtors' operations; or perhaps Barclays

otherwise benefited from the transfer, or even caused the transfer. Appellants argued that these concerns cast doubt on whether Barclays was a purchaser in good faith. In addition, Appellants argued that the bankruptcy court would violate due process if it found that Barclays was a good faith purchaser without allowing additional time for discovery on the Defalcated Funds issue. Appellants' objection, however, stopped short of alleging that Barclays actually knew about, benefited from, or was involved with the transfer. In fact, the objection said: "Bay Harbour is not alleging that [Barclays] was [involved in the transfer of Defalcated Funds]. It is alleging that neither [Bay Harbour] nor this Court knows."

Although Appellants' claim, if any, to these Defalcated Funds was merely derivative of any LBIE claim, the LBIE Joint Administrators did not file any objection to the sale on the basis of the Defalcated Funds. Indeed, they supported the sale. Counsel to the Joint Administrators noted that because "no cash was being transferred to the purchaser" the issue of the cash owed to LBIE was "probably not an issue for the purchaser."

The bankruptcy court directly addressed the Defalcated Funds. It agreed with the Joint Administrators' counsel that the allegations about LBIE's cash being wrongly possessed by LBI were not relevant to the sale because no cash was being transferred to Barclays under the proposed sale. Judge Peck

10

said: "I'm satisfied that given the fact that Barclays is not taking cash and the only thing that came into the debtor from Europe was cash that in practical terms we should be safe."

Ultimately, the court rejected Appellants' objection and approved the sale. It reiterated that "this is really not a question of due process being denied." The court emphasized that the proposed sale was "the only available transaction;" and it called the idea of delaying approval of the sale with hope that a better transaction would come along "preposterous." The consequences of not approving the transaction, according to the court, "could prove to be truly disastrous," and the "harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." By the end of the hearing, the court felt that everything it heard "was indicative of arm's length, good faith, aggressive negotiations" and that it had "heard ample evidence . . . that would support good faith findings."

Sale Order

On the basis of these conclusions about the sale procedure, the bankruptcy court entered the Sale Order on September 20, 2008.[6] The Sale Order found that "good cause exists to shorten

---

[6] The Court concurrently issued an order approving the sale in the SIPA proceeding.

11

the applicable notice periods," that "due, proper, timely, adequate and sufficient notice" of the motion and hearing had been provided, and that a "reasonable opportunity to object and to be heard" had been given to all interested persons and entities.

Again, the court emphasized that if it did not approve the sale on an expedited basis, the Debtors' estates would suffer "immediate and irreparable harm." This was the case, in part, because "[n]o other person or entity or group of entities, other than [Barclays], has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates." As such, the sale was "necessary and appropriate to maximize the value of the Debtors' estates," and thereby served the "best interests of the Debtors, their estates, their creditors and other parties in interest."

The Sale Order deemed Barclays a purchaser in good faith. The court noted that the purchase agreement was "negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's-length bargaining positions." The order explicitly noted that Barclays was "a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m)." As such, the order conveyed the assets to Barclays "free and clear of all Liens, claims . . ., encumbrances, obligations, liabilities,

contractual commitments, rights of first refusal or interests of any kind or nature whatsoever." The bankruptcy court noted the importance of this provision to Barclays:

> The Purchaser asserts that it would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby . . . if the sale of the Purchased Assets . . . to the Purchaser . . . was not free and clear of all Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

The Sale Order instructed parties wishing to appeal the order to pursue a stay of the Sale Order. It warned that "[a]ny party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot." Before the sale was consummated, Appellants filed a notice of appeal on September 21 and amended it the next day. Appellants did not, however, seek a stay of the Sale Order. The sale closed September 22. After that closing, over 135,000 LBI customer accounts were transferred to Barclays or other institutions and more than a hundred billion dollars of customer property followed. Based on the bankruptcy court's authorization of the sale, the Trustee in the SIPA proceeding mailed over 900,000 claim forms.

Appellants now bring this appeal. They argue the bankruptcy court erred by: (1) finding that Barclays was a good faith purchaser pursuant to Section 363 of the Bankruptcy Code;

13

(2) concluding that the sale complied with the Fifth Amendment's Due Process Clause; and (3) approving a sale free and clear of liabilities to Barclays.

In their reply brief Appellants clarify they are "not seeking to unwind the sale." They ask this Court instead to revise the terms of the sale by reversing the Bankruptcy Court's good faith purchaser finding, which would mean Barclays did not take LBI's assets free and clear of all interests.

DISCUSSION

District courts are vested with appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a), and may "affirm, modify, or reverse a bankruptcy judge's judgment, order or decree." Fed R. Bankr. P. 8013. On appeal, the legal conclusions of the bankruptcy court are reviewed de novo, but the findings of fact are reversed only when they are "clearly erroneous." Id.; AppliedTheory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.), 493 F.3d 82, 85 (2d Cir. 2007). While the bankruptcy court's findings of fact are not conclusive on appeal, "the party that seeks to overturn them bears a heavy burden." H & C Dev. Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (2d Cir. 1999). The reviewing court must be left with a "definite and firm conviction" that a mistake has been made. Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003)

14

(citation omitted).  Mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual."  Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300, 316 n.11 (2d Cir. 2009) (citation omitted).

I. Purchaser in Good Faith Status

Although the Bankruptcy Code does not define "good faith purchaser," the Second Circuit has adopted the traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims."  Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997) (citation omitted) ("Gucci II").  To determine a purchaser's good faith, courts look to "the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made."  Id.  Good faith is absent where a purchaser engaged in "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Id. (citation omitted).  The "good-faith purchaser" determination "is a mixed question of law and fact."  Id. (citation omitted).  Thus, this Opinion must review the issue of whether the bankruptcy court applied the correct legal standard

15

de novo; and it must review the court's factual determinations under the clearly erroneous standard.

Appellants do not take issue with the bankruptcy court's choice of legal standard; rather, they argue that the court erred in making its factual determination that Barclays satisfied the definition of a purchaser in good faith. They assert that "the Court had no evidentiary basis to support its conclusion that Barclays purchased the assets without knowledge that some or all of the Defalcated Funds were being conveyed to them or had been used to prop up LBI in contemplation of its Sale." They object to the fact that the bankruptcy court "foreclosed any factual investigation into Barclays's conduct and then issued findings based on [the court's] own speculation that Barclays was not complicit in or a beneficiary of the misappropriation of the Defalcated Funds."

The court, however, did not base its determination of Barclays's good faith on speculation. It based its conclusion on evidence presented at the sale hearing, which was sufficient to support its finding. As such, Appellants have failed to carry their heavy burden to show that the finding was clearly erroneous. The court relied on the testimony of both McDade and Ridings to support its good faith findings. Cross-examination of these witnesses failed to unearth evidence of fraud, collusion, or any impropriety. After hearing testimony at the

16

sale hearing, Judge Peck said "I try to listen with great care to the evidence that's being put into the record to support findings . . . and everything that I heard was indicative of arm's length, good faith, aggressive negotiations."

Despite the fact that Appellants' objection was based on speculation rather than evidence, the court carefully considered Appellants' claims about the Defalcated Funds.  Judge Peck ultimately found that the claims regarding the Defalcated Funds were irrelevant to Barclays's good faith status.  Noting that Debtors proposed to transfer to Barclays only securities and other property, and not cash, the Court determined that it was "safe" to approve the sale.  Appellants' speculation is insufficient to show that the court's conclusion was clearly erroneous.  The bankruptcy court's determination of Barclays's good faith status is therefore affirmed.

II. Statutory Mootness

Appellees argue that Section 363(m) of the Bankruptcy Code limits appellate jurisdiction to the issue of Barclays's status as a good faith purchaser.  Under Section 363(m),

> The reversal or modification on appeal of an
> authorization under subsection (b) . . . of this
> section of a sale . . . of property does not affect
> the validity of a sale . . . under such authorization
> to an entity that purchased . . . such property in
> good faith . . . <u>unless such authorization and such
> sale . . . were stayed pending appeal</u>.

17

11 U.S.C. § 363(m) (emphasis supplied).  Pursuant to this section, "appellate jurisdiction over an unstayed sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser."  Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 105 F.3d 837, 839 (2d Cir. 1997) ("Gucci I").

Limiting appellate jurisdiction over unstayed sale orders to the issue of good faith "furthers the policy of finality in bankruptcy sales and assists the bankruptcy court to secure the best price for the debtor's assets."  Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 272 (2d Cir. 1997) (citation omitted).  "[W]ithout this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property."  Gucci II, 126 F.3d at 387.

Despite the fact that the Sale Order explicitly cautioned any party wishing to appeal the order to pursue a stay or "risk its appeal being foreclosed as moot," Appellants failed to seek a stay.  The sale then closed on September 22, 2008.  As a result, the only issue this Court may consider on appeal is whether the bankruptcy court committed reversible error in finding that Barclays was a good faith purchaser.  As discussed

above, the bankruptcy court did not commit reversible error in determining Barclays's good faith status.

Appellants seek to escape the limitations imposed by Section 363(m) by arguing in their reply brief that they do not challenge the sale, but only the terms of the sale, which delivered the LBI assets to Barclays free and clear of liens. This is a specious distinction. As the bankruptcy court found, Barclays demanded that the sale be free and clear of liens, and without that term no sale would have occurred. The bankruptcy court's approval of the sale on these terms was unremarkable and utterly consistent with its duty to maximize the value of the Debtors' estate with the benefit of the finality provided by Section 363(m).

Consequently, statutory mootness forecloses Appellants' arguments beyond the issue of Barclays's good faith. Appellants having sought no relief that stops short of challenging the validity of the entire sale, see Gucci I, 105 F.3d at 839-40 & n.1, Appellants' request for relief is moot under Section 363(m).[7]

---

[7] Even if this Court were to consider the remaining merits of the appeal, Appellants would lose. First, since Appellants failed to obtain a stay and allowed a comprehensive change in circumstances to take place, the appeal is equitably moot. Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993); Official Comm. Of Unsecured Creditors of LTV Aerospace and Def. Co. v. Official Comm. Of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.),

CONCLUSION

The bankruptcy court's September 20, 2008 Sale Order and Incorporation Order are affirmed. The appeal is dismissed.

SO ORDERED:

Dated:   New York, New York
         March 13, 2009

                                    _____
                                           DENISE COTE
                                    United States District Judge

---

988 F.2d 322, 325 (2d Cir. 1993); see also Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005).
    Second, Judge Peck appropriately considered and resolved due process interests throughout the sale process. Judge Peck correctly determined that Appellants had sufficient notice and opportunity to be heard. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); Brody v. Village of Port Chester, 434 F.3d 121, 127 (2d Cir. 2005).
    Finally, the bankruptcy court found that LBI's assets could be sold free and clear under 11 U.S.C. § 363. Appellants' challenge of this provision relies entirely on the premise that the bankruptcy court committed reversible error in determining the good faith issue, an argument this Opinion has rejected.